# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DAVID THOMAS,

                Plaintiff,

v.

                                   Case No. 15-CV-633-JPS

CORRECTIONAL HEALTHCARE
COMPANIES, INC., CHRISTOPHER
SCHMALING, DR. ORTIZ, and
JANE/JOHN DOES 1, 2, 3, and 5,
                                **ORDER**

                Defendants.

## 1.     INTRODUCTION

Plaintiff David Thomas ("Thomas"), a prisoner, brings this action against several prison employees for injuries he suffered while incarcerated at the Racine County Jail. The Court permitted two claims to proceed beyond the screening stage. (Docket #22); *see* 28 U.S.C. § 1915A. First, Thomas claims that Defendant Christopher Schmaling ("Schmaling"), the Racine County sheriff, negligently failed to maintain the jail in a condition that was reasonably safe for the inmates, in violation of the Wisconsin safe place statute, Wis. Stat. § 101.11. In particular, Thomas claims that Schmaling provided him with a stool to climb in and out of the top bed bunk to which he was assigned when Schmaling should have provided a ladder affixed to the bed. Thomas fell while attempting to climb out of his bunk and fractured his arm. Second, Thomas claims that several persons on the medical staff at the jail, including Defendants Dr. Ortiz, Does 1, 2, 3, and 5, and Correctional Healthcare Companies, Inc. ("CHC"), showed deliberate indifference to his serious medical needs, in violation of the Eighth Amendment, when they

denied his requests for a lower-bunk restriction and provided belated and inadequate medical treatment for his broken arm.

On September 23, 2016, Schmaling filed a motion for summary judgment. (Docket #59). Three days later, on September 26, 2016, CHC and Dr. Ortiz did the same. (Docket #65). On October 31, 2016, after the deadline for responding to either motion had expired, Thomas filed a motion for extension of time to respond to Defendants' motions. (Docket #70). The Court granted Thomas' motion and gave him until November 7, 2016, to file his responses. (Docket #71 at 1–2). Thomas did not file his responses until November 9, 2016, (Docket #72, #73, #74, and #75), but the Court will overlook the two-day delay in light of Thomas' *pro se* status. Defendants filed their replies on November 17, 2016. (Docket #76 and #83). The Court will grant both motions.

2.      **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688,

691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

**3.    RELEVANT FACTS**

The following facts are drawn from the parties' proposed statements of fact, viewed in the light most favorable to Thomas. The Court recounts only those facts necessary to disposition of the motions.

During the period relevant to this lawsuit, Thomas was confined at the Racine County Jail (the "Jail"). (Docket #75 at 6 ¶ 1).[1] Upon entering the Jail in November 2011, a medical screening was administered wherein Thomas was asked questions regarding his physical and mental health. *Id.* at 6 ¶ 2. The medical screening report indicates that Thomas declined to identify any physical limitations or restricted mobility that would require immediate accommodation. *Id.* at 6 ¶ 3. The report also reflects that Thomas declined to identify any current medical conditions. *Id.* at 6 ¶ 4. However, during the screening, Thomas indicated that he had a crushed heel and that he had two prior gunshot wounds from 2007, one of which was to his right ankle, and that he had suffered a slipped disc in 2003. *Id.* at 6 ¶¶ 3–4.

Thomas alleges that a month after his initial medical screening, he informed two other members of the jail medical staff, Doe defendants 1 and 2, of his gunshot injuries. (Docket #19 ¶ 5). He requested assignment to a

---

[1]Thomas responded in one document to the statements of fact in support of each motion for summary judgment. This can cause some confusion in the paragraph numbering for each statement of fact. For clarity, the Court will reference both the page and paragraph number in its citations.

lower bunk in light of these injuries, but Does 1 and 2 denied the request for reasons not explained in the record. *Id.*

Thomas was assigned to an upper bed bunk in his cell at the Jail. In April 2012, Thomas filed a written request for assignment to a lower bunk, arguing that his crushed heel made it difficult for him to climb in and out of bed. (Docket #75 at 7 ¶ 6).[2] There is no record of the response to the request, though the Court assumes it was either ignored or denied. *See id.* Schmaling asserts that no record in Thomas' medical file shows that any medical staff deemed it medically necessary for him to be placed in a lower bunk. *Id.* at 7 ¶ 5. Thomas, on the other hand, believes that his reported crushed heel, gunshot wounds, and prior slipped disc, in combination with his April 2012 request for a lower bunk assignment, sufficed to put Schmaling on notice that Thomas needed a lower bunk assignment. *See id.*

On September 7, 2012, Thomas fell while attempting to climb down from his bunk. *Id.* at 7 ¶ 7. Thomas completed a medical request form at around 4:00 p.m. that day referencing the incident and stating that he twisted his wrist and was in a lot of pain. *Id.* at 3 ¶ 12. Thomas was assessed by Doe Defendant 3, a nurse practitioner, at approximately 6:00 p.m. that same day. *Id.* at 3 ¶ 13; *see* (Docket #19 ¶¶ 8–10). Doe 3 noted that Thomas had chronic pain in the same arm due to a 2007 gunshot wound, and that he reported falling out of the bunk and landing on his forearm. (Docket #75 at 3 ¶ 14). Doe 3 further noted that "[n]o deformity or swelling noticed. Able to move

---

[2]Schmaling devotes much of his reply to contesting the authenticity of this April 2012 inmate complaint and two later complaints—one on September 20, 2012 and the second on October 8, 2012—which are discussed further below. *See* (Docket #76 at 2–5). Because the Court's disposition does not rest on the authenticity of Thomas' inmate complaints, the Court will assume for purposes of this order that they are authentic and were submitted consistent with Jail procedures.

Case 2:15-cv-00633-JPS   Filed 12/02/16   Page 4 of 25   Document 90

arm, bend elbow. Wrist movements painful and restricted." *Id.* Finally, Doe 3 observed that Thomas' vital signs were normal. *Id.* Doe 3 wrote that Thomas should receive ibuprofen 800 mg bi-daily for fifteen days, and Thomas was provided a left forearm brace to wear for one month. *Id.* at 3 ¶ 15. Her notes reflect that she offered Thomas to be moved to a low bunk and that he declined because he was "alright" and didn't want a different cellmate. *Id.* Thomas, however, avers that he orally requested a lower bunk assignment and merely suggested that he wanted to stay in his current cell because he liked his cellmate. *Id.* For purposes of the present motions, the Court credits Thomas' version of this exchange.

Thomas was assessed again by Doe 3 on September 10, 2012. *Id.* at 3 ¶ 16. She noted that Thomas "continues to have pain and the forearm is slightly swollen now." *Id.* She ordered an x-ray of Thomas's left forearm. *Id.* The x-ray was taken the next day. *Id.* at 3 ¶ 17. The x-ray was interpreted by Doe 5, a radiologist, whom Defendants identify as Dr. Elliot Wagner. *Id.*; *see* (Docket #19 ¶ 11). Doe 5 observed that Thomas had an "acute fracture of the mid-radius with no displacement. No displacement [was] seen. The visualized elbow and wrist [were] normal." (Docket #75 at 3 ¶ 17).

Dr. Ortiz was employed by CHC to provide on-site healthcare to inmates at the Jail. *Id.* at 2 ¶ 9. He avers that a non-displaced fracture is a fracture in which the bone breaks fully or partially, but still moves, maintains the correct alignment, and does not protrude from the skin. *Id.* at 4 ¶ 18. Thomas disagrees, stating that "[j]ust because the radius was not displaced at the time of the x-ray does not mean the radius maintained the correct alignment at all times." *Id.* He further avers that he "felt pain when he moved his wrist even the slightest amount because the radius was fractured." *Id.*

Case 2:15-cv-00633-JPS   Filed 12/02/16   Page 5 of 25   Document 90

Dr. Ortiz was consulted by telephone approximately forty minutes after the x-ray results were received and he gave a verbal order for Thomas to be referred to an orthopaedic specialist for treatment. *Id.* at 4 ¶ 19. Thomas was taken to an orthopaedic doctor at Wheaton Franciscan Hospital on September 14, 2012, where his arm was placed in a cast. *Id.* at 4 ¶ 20. Thomas underwent a follow-up appointment at the hospital on October 1, 2012. *Id.* at 4 ¶ 21. The findings and orders from that follow-up appointment are not indicated in the record.

Dr. Ortiz opined that he is not responsible for making outside medical appointments for inmates. *Id.* at 4 ¶ 22. Instead, that duty is shared by healthcare and correctional staff. *Id.* Thomas, by contrast, contends that Dr. Ortiz "had a professional responsibility to insure that Thomas received immediate medical treatment for the radius being fractured and the x-rays" and that Dr. Ortiz "should have ordered Thomas to be taken to the hospital immediately to have the arm put in a cast." *Id.* In Thomas' view, "[a]llowing 3 more days to elapse before treatment of Thomas' fractured radius was improper," particularly considering that there was a total of seven days' time from fracture to hospital treatment. *Id.* Thomas avers that CHC has a policy or custom that nurse practitioners or doctors are not required to order immediate treatment of broken bones and instead allow a three-day delay between diagnosis and treatment and a seven-day delay between actual injury and treatment. (Docket #74 ¶ 48).

Three weeks after his fall, on September 20, 2012, Thomas filed an inmate complaint relating to his injury. (Docket #75 at 8 ¶ 13). He stated, in relevant part, that he "[has] a crushed heel bone," that he "was denied a low bunk," that he fell getting out of bed when "[t]he stool moved and my hand slipped," and that he broke his wrist when he fell. *Id.* He received no

response to this complaint. *Id.* He filed a second complaint, which he calls his "appeal" of the first complaint, on October 8, 2012. *Id.* There, he argues for the first time that he should have been provided a ladder to get in and out of bed rather than a stool. *Id.*

Thomas filed a request for medical attention on November 25, 2012, asking that he be assigned a lower bunk because of his crushed heel and his recently broken wrist. *Id.* at 10 ¶ 17. The request was denied for unspecified reasons. *Id.* at 10 ¶ 18. Thomas made a similar request on December 10, 2012, and this time the request was granted. *Id.* at 10 ¶¶ 19–20. In this request, Thomas attributed his September 7, 2012 fall to the fact that his crushed heel caused his foot to fall asleep during the night and that, in turn, caused him to slip as he was climbing down from bed that day. *See id.*

Other than Thomas' claims asserted in this case, there are no known reports of inmates housed at the Jail who claimed, prior to September 7, 2012, that they fell while climbing to or dismounting from the top bunk and that the fall was attributable to the negligent or defective design of the jail. *Id.* at 11 ¶ 22.[3] The Jail undergoes yearly inspections by the Wisconsin Department of Corrections. *Id.* at 11 ¶ 23. There is no known record from the Wisconsin

---

[3]Thomas alleges that he was never provided such reports, (Docket #74 ¶25), but the blame here lies with him, not Schmaling. Thomas' motion to compel (Docket #52), filed on August 3, 2016, stated that Schmaling had not responded to his requests for production, including requests for other inmate complaints relating to climbing in and out of top bunks. Thomas agreed to an extension of time to permit Schmaling to respond to Thomas' requests. *See* (Docket #54). Schmaling served his responses on August 12, 2016. (Docket #78-3 at 8). Schmaling objected to the request for other inmate complaints as overbroad and responded substantively that no such records existed. (Docket #78 ¶ 9). Thomas never challenged Schmaling's response and the time for doing so has passed. Accordingly, Thomas' mere suggestion that Schmaling is withholding relevant records is not sufficient to raise a genuine dispute as to this fact.

Case 2:15-cv-00633-JPS   Filed 12/02/16   Page 7 of 25   Document 90

Department of Corrections or any other authority indicating that the configuration and design of the housing unit in which Thomas was housed on September 7, 2012, was unsafe before or after that date, nor is there a record indicating that it was necessary—before or after September 7, 2012—to provide an affixed or designated ladder to alleviate risks associated with an inmate's climb to the top bunk. *Id.* at 11 ¶¶ 24–25. Despite this, Thomas claims that Schmaling knew of the problem inmates faced in climbing in and out of their bunks with unstable stools as opposed to fixed ladders. (Docket #74 ¶ 28). Thomas believes that "just because [records] do not exist does not necessarily mean that falls did not occur." (Docket #75 at 11 ¶ 22).

## 4.    ANALYSIS

Summary judgment is appropriate in favor of Schmaling, Dr. Ortiz, and CHC. Schmaling is immune from Thomas' claim of negligence, while Thomas fails to marshal any competent evidence that Dr. Ortiz and CHC provided constitutionally inadequate medical care. As to the Doe defendants, however, the Court will give Thomas one final chance to identify these individuals before it will dismiss Thomas' claims without prejudice for failure to prosecute. Thomas has to date not satisfied his obligation to identify these individuals so that the case may proceed against them.

### 4.1    Negligence

Schmaling raises several arguments as to why he believes Thomas' claim against him must be dismissed. The Court need address only one—governmental immunity under Wis. Stat. § 893.80(4)—to dispose of the claim. Thomas avers that Schmaling, in his official capacity as Racine County sheriff, had a common-law duty to maintain the Racine County Jail in a safe condition for inmates. (Docket #73 ¶ 26). Thomas points in particular to the

requirements of the Wisconsin safe place statute, Wis. Stat. § 101.11, as informing the scope of Schmaling's duty. He argues that Schmaling violated this duty by providing inmates with unstable, moving stools, rather than fixed ladders, for ingress and egress from top bunks. (Docket #72 at 4–5). Viewing the facts at hand in the light most favorable to Thomas, Schmaling enjoys immunity from such a claim.

A Wisconsin official like Schmaling, when sued in his official capacity, is immune from liability for "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Wis. Stat. § 893.80(4). Wisconsin courts have interpreted this protection as extending to all conduct involving "the exercise of discretion and judgment." *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 691 N.W.2d 658, 677 (Wis. 2005) (quotation omitted). There are, however, four categories of acts to which immunity does not apply: "(1) ministerial duties imposed by law, (2) duties to address a known danger, (3) actions involving professional discretion, and (4) actions that are malicious, willful, and intentional." *Scott v. Savers Prop. & Cas. Ins. Co.*, 663 N.W.2d 715, 721 (Wis. 2003). It should be noted that the ministerial exception is not really an exception to immunity at all; instead, it denotes situations in which immunity does not apply in the first place because the act in question was non-discretionary. *See Spencer v. Cnty. of Brown*, 573 N.W.2d 222, 224 (Wis. Ct. App. 1997), *abrogated on other grounds*, *Blum v. 1st Auto & Cas. Ins. Co.*, 786 N.W.2d 78, 90 (Wis. 2010). The immunity afforded by Section 893.80(4) and the exceptions thereto represent "a judicial balance struck between 'the need of public officers to perform their functions freely [and] the right of an aggrieved party to seek redress.'" *C.L. v. Olson*, 422 N.W.2d 614 , 617 (Wis. 1988) (quoting *Lister v. Bd. of Regents of Univ. of Wis. Sys.*, 240 N.W.2d 610, 621 (Wis. 1976)).

Case 2:15-cv-00633-JPS   Filed 12/02/16   Page 9 of 25   Document 90

Here, viewing Thomas' filings generously, he challenges Schmaling's assertion of immunity under the ministerial and the known-danger exceptions.[4] The Court will examine each in turn.

### 4.1.1 Ministerial Versus Discretionary Duties

The ministerial exception removes an official's immunity where the duty in question "is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes, and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister*, 240 N.W.2d at 622. In contrast to ministerial tasks, discretionary acts require a public official to determine how a general policy should be carried out or how a general rule should be applied to a specific set of facts. *Lifer v. Raymond*, 259 N.W.2d 537, 541 (Wis. 1977). Even acts performed pursuant to a legal obligation may be discretionary because those acts may still allow room for judgment. *Scott*, 663 N.W.2d at 722. A key step in inquiring whether an act is discretionary or ministerial is to identify the law creating the duty to act. *Legue*, 849 N.W.2d at 294. "Where there is a written law or policy defining a duty, we naturally look to the language of the writing to evaluate whether the duty and its parameters are expressed so clearly and precisely, so as to eliminate the official's exercise of discretion." *Pries v. McMillon*, 784 N.W.2d 648, 656 (Wis. 2010).

---

[4] Though the name suggests broad application, the "professional discretion" exception to Section 893.80(4) immunity "has been limited to the medical setting." *Scott*, 663 N.W.2d at 724. As for the final exception to immunity, Thomas does not allege in any pleading, nor has he produced any evidence showing, that Schmaling acted maliciously when he neglected his duty to provide safe housing. Thus, neither the third nor fourth exceptions have any bearing on this case.

The Court begins, therefore, with the alleged source of Schmaling's duty: the Wisconsin safe place statute. That statute sets forth a heightened duty on owners of public buildings to construct, repair, or maintain buildings safely. Wis. Stat. § 101.11; *Mair v. Trollhaugen Ski Resort*, 715 N.W.2d 598, 604 (Wis. 2006). The statute provides, in relevant part:

> Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe.

Wis. Stat. § 101.11(1). Wisconsin courts have not decided whether the duty imposed by Section 101.11 applies to prison facilities. *Spencer*, 573 N.W.2d at 225. The Court need not decide that question today, however, since any duty under Section 101.11 would be discretionary as applied to Schmaling.

Under very similar facts, the Wisconsin Court of Appeals in *Spencer* recognized that the safe place duty imposed by Wis. Stat. § 101.11—assuming such a duty applied to prisons—is discretionary, not ministerial. *Id.* at 226. There, a prison inmate was injured when he slipped and fell on a terrazzo floor in the shower area. *Id.* at 224. The court rejected the inmate's contention that the sheriff had a ministerial duty to make the shower safer, such as by providing railings or skid-proof floors. *Id.* at 226. The court observed that the safe-place statute required the defendant "to use *reasonably adequate methods*

to make the shower area safe, and to do every other thing *reasonably necessary* to protect the safety of individuals like [the inmate]." *Id.* (emphasis in original). In the court's view, "[t]his language implies the exercise of discretion and judgment by government officials in determining what measures are reasonably necessary to make the shower facilities safe." *Id.* The statute does not supply specificity "as to time, mode and occasion 'with such certainty that nothing remains for judgment or discretion.'" *Id.* (quoting *Stann v. Waukesha Cnty.*, 468 N.W.2d 775, 779 (Wis. Ct. App. 1991)); *see also Larsen v. Wis. Cnty. Mut. Ins. Co.*, 855 N.W.2d 493, at *3 (Wis. Ct. App. 2014).

So too, here, Schmaling's alleged duty was discretionary. Thomas' argument is not appreciably different from that of the inmate in *Spencer*. In both instances, the inmate asserted that certain measures would better protect them from injury. In the case of the prison shower in *Spencer*, the Wisconsin Court of Appeals determined that the sheriff enjoyed discretion in deciding how best to use the resources at his disposal to fashion appropriate safeguards in the shower area. Likewise, the general duty imposed by Section 101.11 left room for Schmaling to exercise judgment in deciding what measures were reasonably necessary to protect Racine County Jail inmates from harm when climbing into and out of their bunk beds. Nowhere does the statute purport to define the contours of the safe place duty with specificity. Thomas' belief as to what measures were reasonably necessary to protect him cannot overcome the discretion afforded to Schmaling in making that determination. Thus, Schmaling's duty under the safe place statute was discretionary, not ministerial.

### 4.1.2   Known and Compelling Danger

Thomas next asserts that even if Schmaling's duty was discretionary, he was aware of Thomas' need for additional accommodation and ignored

it. Even if Schmaling had discretion in deciding how to provide adequately safe housing for Racine County Jail inmates, "he now knows of the problem of no ladders and moving stools and has an affirmative duty to alleviate the known risks by either securing the stools so they don't move or adding ladders to the bunks." (Docket #72 at 5). This, Thomas argues, falls within the known-danger exception to immunity under Section 893.80(4).

The known-danger exception, similar to the ministerial exception, applies in instances where "there exists a known present danger of such force that the time, mode and occasion for performance [are] evident with such certainty that nothing remains for the exercise of judgment and discretion." *Lodl v. Progressive N. Ins. Co.*, 646 N.W.2d 314, 324 (Wis. 2002) (quotation omitted). In other words, the danger must be an "accident waiting to happen." *Heuser ex rel. Jacobs v. Comm. Ins. Corp.*, 774 N.W.2d 653, 659 (Wis. Ct. App. 2009) (quotation omitted). The circumstances must be "sufficiently dangerous so as to give rise to a ministerial duty—not merely a generalized 'duty to act' in some unspecified way, but a duty to perform the *particular* act upon which liability is premised." *Lodl*, 646 N.W.2d at 324 (emphasis added). Put differently, the official must have failed to make a particularized response that was required under the circumstances presented. *Heuser,* 774 N.W.2d at 660. If the official takes action to minimize or remedy a known danger, he will enjoy immunity even if the particular measures he enacted were insufficient to prevent harm. *Id.* at 662. The choice of remedy is within the official's discretion and is therefore shielded by immunity under Section 893.80(4). *Id.* ("[I]f the officer acted to minimize the danger, then the action chosen was 'something' and, whatever the choice, it was within that actor's discretion."); *Elmer v. Wis. Cnty. Mut. Ins. Co.*, 800 N.W.2d 957, at *5–6 (Wis. Ct. App. 2011) (immunity applied where county officials took some steps to

Case 2:15-cv-00633-JPS   Filed 12/02/16   Page 13 of 25   Document 90

avert the danger presented by road work, including signage and a speed-limit reduction, even though those measures did not ultimately avert harm). Only by doing nothing in response to a known danger will the official open himself to liability. *Heuser*, 774 N.W.2d at 662.

Thomas' claim fails to meet the known danger exception for several reasons. First, while all persons face the danger of a fall from getting in and out of a bunk bed, this danger pales in comparison to those obvious and compelling dangers recognized in Wisconsin courts as warranting abrogation of immunity. *See, e.g.*, *Cords v. Anderson*, 259 N.W.2d 672, 680 (Wis. 1977) (park ranger ignored danger presented by hiking trail that passed within inches of a ninety-foot gorge); *Domino v. Walworth Cnty.*, 347 N.W.2d 917, 919 (Wis. 1984) (sheriff's dispatcher failed to warn motorists of a fallen tree that blocked a road). Second, Thomas did not suffer any falls between his arrival at the Racine County Jail in November 2011 and his injury in September 2012. During that entire period, Thomas used a stool to enter and exit his top bunk. As a result, it is difficult to conclude that Thomas' injury, even if foreseeable, was "an accident waiting to happen." *Heuser*, 774 N.W.2d at 659. Indeed, the Court of Appeals in *Spencer* did not find the danger of a fall in the shower to be compelling although the inmate in that case suffered from a noticeable limp and showered without problems for only five days before he fell. *Spencer*, 573 N.W.2d at 227. Thomas' ability to successfully navigate in and out of his bunk for nearly a year belies his claim that there was an immediate, obvious danger in need of the specific response he proposes. The obviousness of the danger is further mitigated by the fact that Schmaling had no records of similar falls from any other inmate. *See supra* note 3.

Third, even assuming that Thomas' injuries were known to Schmaling and presented a danger sufficient to require accommodation, *Heuser* and

Case 2:15-cv-00633-JPS   Filed 12/02/16   Page 14 of 25   Document 90

*Elmer* teach that Schmaling nevertheless enjoys immunity because he did something to alleviate the danger presented. Unlike cases where the official in question simply ignored a known, compelling danger, *see, e.g., Cords*, 259 N.W.2d at 680, here Schmaling provided a stool as an accommodation for inmates trying to get in and out of the top bunk. Thomas accuses Schmaling of failing to do more—of failing to provide a ladder secured to the bed—but that is not enough. Schmaling had discretion to address the danger using his own judgment, even if Thomas believes he was entitled to some special accommodation. Immunity attaches to Schmaling's decision on the appropriate remedy. *Heuser*, 774 N.W.2d at 662; *Elmer*, 800 N.W.2d 957, at *5–6; *Larsen*, 855 NW.2d 493, at *7; *Edwards ex rel. Edwards v. Baraboo Sch. Dist.*, 803 N.W.2d 868, at *6 (Wis. Ct. App. 2011) ("Where a situation is dangerous but the danger is of such a nature that the municipal officer or employee could reasonably respond in more than one way, this exception does not apply."); *Recore v. Cnty. of Green Lake*, 879 N.W.2d 131, 136 (Wis. Ct. App. 2016) (once a reasonable response is undertaken, the nature and scope of the response is a matter of discretion). Thus, Schmaling qualifies for immunity under Wis. Stat. § 893.80(4) and no exception applies.[5]

---

[5] In closing, Thomas suggests that even if Schmaling was immune from money damages under Section 893.80(4), Thomas would still be entitled to injunctive or declaratory relief. *Id.* This claim is belied by the language of the statute, which provides that any official protected by Section 893.80(4) should be free from "any suit" based on the conduct in question. Wis. Stat. § 893.80(4); *Willow Creek Ranch, L.L.C. v. Town of Shelby*, 611 N.W.2d 693, 701 (Wis. 2000) ("[T]he official immunity provisions of Wis. Stat. § 893.80(4) are not limited to money damages or tort actions, but apply as well to actions seeking injunctive relief against municipalities and their employees.").

### 4.2    Deliberate Indifference

Thomas' deliberate indifference claim against Dr. Ortiz and CHC must be dismissed as well. Thomas asserts that the Dr. Ortiz displayed deliberate indifference to his serious medical needs, in violation of the Eighth Amendment, when he provided delayed and substandard treatment for his September 7, 2012 injury. Thomas further alleges that CHC had an unconstitutional policy or practice permitting their staff to delay medical treatment for injuries like his. The claims present no triable questions of fact for the jury and must, as a matter of law, be rejected.

For an Eighth Amendment claim of deliberate indifference to a serious medical need, the plaintiff must prove: (1) an objectively serious medical condition; (2) that the defendants knew of the condition and were deliberately indifferent in treating it; and (3) this indifference caused the plaintiff some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).[6] The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Id.* Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)).

Negligence cannot support a claim of deliberate indifference, nor is medical malpractice a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The question is not whether the plaintiff believes some other course of treatment would have

---

[6]Dr. Ortiz and CHC do not contest for purposes of their motion that Thomas' injury was a serious medical condition. (Docket #66 at 7).

been better. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Instead, he must prove that the defendant's treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996). Put differently, the plaintiff must show that his medical providers made treatment decisions "'so dangerous' that the deliberate nature of [their] conduct can be inferred." *Gayton*, 593 F.3d 623 (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)); *see also Walker v. Zunker*, 30 F. App'x 625, 628 (7th Cir. 2002) ("Mere dissatisfaction with a particular course of treatment, or even malpractice, does not amount to deliberate indifference."). Courts must "must examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 591 (7th Cir. 1999).

The undisputed facts show that Doe 3 initially assessed Thomas' injury within hours of his fall. She found that Thomas had no swelling or deformity in his arm and that he was able to move his arm. Nevertheless, in light of his complaints of pain, she prescribed a heavy dosage of ibuprofen and provided him with a forearm brace. Doe 3 saw Thomas again three days later after he continued to complain of pain. She noticed swelling in his arm and ordered x-rays. The x-rays, which were taken on September 11, 2012 and were interpreted by Doe 5, showed a non-displaced fracture of the wrist. Doe 5 provided these results to Dr. Ortiz within an hour, who then gave the order for Thomas to be referred to an orthopaedic specialist for treatment. Thomas received treatment at Wheaton Franciscan Hospital on September 14, 2012

and his arm was placed in a cast. He had a follow-up appointment at the hospital on October 1, 2012.

The evidence Thomas marshals in support of his deliberate indifference claim falls well short of raising triable questions of fact. At best, he offers only his own views as to what treatment he should have received. Thomas alleges that Doe 3 should have: (1) ordered x-rays right away on September 7, 2012; (2) given him stronger pain medication; (3) seen him sooner to address his continued complaints of pain after September 7, 2012; and (4) ensured that he received his ultimate treatment—having his arm placed in a cast—more quickly. Similarly, he argues that Dr. Ortiz unreasonably delayed his appointment at the hospital for three days when Dr. Ortiz should have ordered the appointment to occur immediately.

Yet Thomas offers no evidence, beyond his own assessment of the circumstances, that these treatment decisions were such a reckless departure from accepted medical standards as to show deliberate indifference to his medical needs. *Estate of Cole*, 94 F.3d at 261–62. Although Thomas blithely contends that a three-day delay from diagnosis to treatment, or a seven-day delay from injury to treatment, constitutes a constitutionally cognizable deprivation of medical care, he does not provide either medical evidence or case citations to support this conclusion. *See Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) (finding that prisoner's desire for immediate treatment did not present triable claim where prison officials responded to his needs "in a timely fashion"). Moreover, as to the quality of the treatment itself, Thomas produced no colorable evidence showing what the standard of care was for treating his injured arm, how that standard was violated, or how that violation meets the high bar required to show that Defendants acted with deliberate indifference to his needs. Instead, he provides bare

statements such as "[j]ust because the radius was not displaced at the time of the x-ray does not mean the radius maintained the correct alignment at all times." (Docket #73 ¶ 4). Thomas' lay opinion on such matters is not enough to resist summary judgment.

Further, while it is true that a delay in treatment can establish deliberate indifference, "'verifying medical evidence' must exist to show how the delay adversely affected a patient's condition." *Reynolds*, 84 F. App'x at 674 (quoting *Langston v. Peters*, 100 F.3d 1235, 1240–41 (7th Cir. 1996)); *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). Thomas provides no such evidence. Thomas does not argue to the Court that his arm failed to heal properly once set in a cast or that there was a delay in healing because of the time between his injury and treatment at the hospital. *See Davis v. Samalio*, 286 F. App'x 325, 328 (7th Cir. 2008) (rejecting uncorroborated contention that prisoner's broken wrist healed incorrectly as a result of a delay in treatment).

Instead, he points to the severe pain he suffered as a result of the allegedly unreasonable delay in treatment. Crediting his representations of pain, as the Court must, the Court can find unconstitutional delay only where the delay was "objectively, sufficiently serious" so as to constitute the "denial of the minimal civilized measures of life's necessities." *Farmer*, 511 U.S. at 834 (quotation omitted). This can occur when prison medical staff ignore a serious, readily treatable medical condition without good reason. *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).

Here, Thomas was provided a fifteen-day, high-dosage course of ibuprofen for his pain, as well as an arm brace. Because his arm did not initially present as swollen or disfigured, the Court cannot find that it was unreasonable for Doe 3 to prescribe only these measures at her initial assessment. *Haley v. Feinerman*, 168 F. App'x 113, 116–17 (7th Cir. 2006) (upholding doctor's initial decision to treat a broken arm with a hanging cast and over-the-counter pain medication rather than more serious measures). Rather, the Court finds that "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations" wherein the treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes*, 95 F.3d at 592 (quotation omitted).

Not until September 10, 2012, did Doe 3 even have notice that Thomas' condition was more serious. Once she gained this knowledge, she ordered x-rays, which occurred the next day. Immediately following the x-rays, Dr. Ortiz put in the order to get Thomas to an orthopaedic specialist for a cast. That happened three days later. Because Thomas was referred to a specialist for setting the fracture, it is not as though Defendants withheld treatment that they could readily have provided. *See Smith*, 666 F.3d at 1040. Instead, they ordered a specialist appointment for him precisely because they could not put a case on his arm on their own. The Court cannot say that the short period between his x-ray and specialist appointment, when considered alongside the stopgap treatment Thomas was provided in the meantime, was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole*, 94 F.3d 254, 261–62.; *Davis*, 286

F. App'x at 328 (prisoner proffered no competent medical evidence supporting his claim that an eight-day delay in treatment had a detrimental effect); *Haley*, 168 F. App'x at 117 (finding no deliberate indifference despite delays of weeks in between x-rays, consultations, and treatment).

Finally, Thomas brings no evidence to bear showing that Dr. Ortiz knew that there would be a three-day delay or that he had the authority to ensure that Thomas be seen more quickly. Defendants' knowledge of the risk of harm caused by delay is crucial to showing that they acted with deliberate indifference to that risk. *Gayton*, 593 F.3d at 620. Again, Thomas' bare reliance on his own judgment about his medical care is inadequate to withstand summary judgment on his deliberate indifference claim. *See Snipes*, 95 F.3d at 591; *Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) ("[T]he Constitution does not mandate that a prisoner receive exactly the medical treatment he desires.").

Accordingly, summary judgment is appropriate on Thomas' claim against Dr. Ortiz. Further, because the Court finds that the delays in Thomas' treatment were not constitutionally impermissible, CHC cannot be liable for having a policy or custom which permitted such delays. *See Minix v. Canarecci*, 597 F.3d 824, 834 (7th Cir. 2010). And, in any event, Thomas provides no evidence that such a policy or custom exists, or that it was the "moving force" behind his injury, beyond his own *ipse dixit*. *See City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985) (plaintiff must show that an unconstitutional policy or custom existed separately from the single incident of harm he may have suffered and was the "moving force" behind the harm). As such, summary judgment must also be entered in favor of CHC.

**5.      The Doe Defendants**

As shown above, Thomas' claims against the named defendants must be dismissed. However, Thomas has brought claims against four Doe defendants, too. Does 1 and 2 allegedly denied him a medical restriction to lower bed bunks. Doe 3, as we have seen, was the nurse practitioner who initially treated Thomas' broken arm. Doe 5 was the radiologist who read the x-ray of Thomas' arm and reported the results to Dr. Ortiz.[7]

The Court is inclined to dismiss the claims against all of these defendants without prejudice for Thomas' failure to prosecute. Thomas had an obligation to identify these individuals through discovery and then seek leave to amend his complaint and effect service on them. *See* Fed. R. Civ. P. 4(m); *Bone v. Walker*, No. 07-1353, 2008 WL 345546, at *3 (C.D. Ill. Feb. 7, 2008). He failed to do so.

Nor does it appear that he has a colorable excuse for this failure. Thomas joined these Doe defendants in his original complaint, filed May 26, 2015. (Docket #1). He also named them in his Second Amended Complaint, filed on December 11, 2015. (Docket #19). He has, therefore, had well over one year to engage in the discovery needed to discern their identities. Yet only in Thomas' recent responses to the motions for summary judgment does he complain that his discovery requests regarding their identities went unanswered. *See* (Docket #74 ¶¶ 49–50).

The record in this case confirms that Thomas' eleventh-hour complaint about discovery comes very late. Thomas filed a motion to compel on August 3, 2016. (Docket #52). He alleged that, among other things, he had not received discovery responses from Dr. Ortiz and CHC that he needed to

---

[7]Doe 4, a CHC employee who ordered Thomas' x-ray, was dismissed at the screening stage. (Docket #22 at 6). On the more developed record presently before the Court, it appears that Does 3 and 4 are actually the same person.

Case 2:15-cv-00633-JPS   Filed 12/02/16   Page 22 of 25   Document 90

identify the Doe defendants. *Id.* at 2. The Court gave the parties additional time to work out their disputes about Thomas' discovery requests. (Docket #57). The Court also ordered the parties to report when the disputes were resolved. *Id.* at 3. Finally, the Court warned, in no uncertain terms, that no additional extensions of time for discovery would be granted. *Id.* at 3.

In an interim settlement report filed on August 25, 2016, counsel for CHC and Dr. Ortiz reported that he and Thomas had discussed Thomas' motion to compel and that Thomas had acknowledged receipt of CHC and Dr. Ortiz' discovery responses. (Docket #58 at 2). Thomas further conceded that "although he had not yet had an opportunity to closely review the documents provided, the discovery issues alleged in his motion to compel were resolved by virtue of the response provided." *Id.* Counsel noted that he "encouraged [Thomas] to contact me if he felt there were any additional materials that were improperly withheld and that, in the event we were unable to resolve the discovery dispute, he could file an additional motion to compel." *Id.*

The parties having resolved their disputes, the Court considered the motion to compel moot. Thomas filed no new motion to compel about deficiencies in the responses he received. Indeed, the Court heard nothing more about it until Thomas, in his November 9, 2016 response to the motions for summary judgment, complained that CHC and Dr. Ortiz had refused to identify the Doe defendants. *See* (Docket #74 ¶¶ 49–50). CHC and Dr. Ortiz deny the accusation, observing that Thomas has provided no evidence of any deficiencies in their discovery responses. (Docket #84 ¶¶ 48–49). Neither did Thomas file a motion to compel in the face of deficient responses, as counsel suggested Thomas should do if he was unhappy with the responses. *See id.*

In light of Thomas' failure to diligent pursue discovery as to the identities of the Doe defendants, the Court would generally dismiss this action with prejudice for Thomas' failure to prosecute the same. *See* Civil L. R. 41(c). However, the Seventh Circuit directs that dismissal of a *pro se* litigant's case with prejudice should almost always be preceded by a warning. *Fischer v. Cingular Wireless, LLC*, 446 F.3d 663, 665 (7th Cir. 2006). Thus, the Court issues this order as Thomas' final warning: if Thomas does not submit an amended pleading which identifies the Doe defendants by name within **fourteen (14) days** of the date of this order, this action shall be dismissed with prejudice and without further notice.

Additionally, in order to ensure that the record is complete with respect to what information Thomas has been provided regarding the identities of the Doe defendants, counsel for Dr. Ortiz and CHC shall file a short notice and affidavit explaining the materials provided to Thomas in discovery that are relevant to this issue, as well as the date those records were provided. This notice shall be filed within **seven (7) days** of the date of this order.

6. **CONCLUSION**

Thomas' claims against the named defendants—Schmaling, CHC, and Dr. Ortiz—must be dismissed with prejudice for the reasons described above. For the Doe defendants, Thomas must identify them or risk dismissal of the case without further notice.

Accordingly,

**IT IS ORDERED** that Defendant Christopher Schmaling's motion for summary judgment (Docket #59) be and the same is hereby **GRANTED**;

Case 2:15-cv-00633-JPS   Filed 12/02/16   Page 24 of 25   Document 90

**IT IS FURTHER ORDERED** that Defendants Dr. Ortiz and Correctional Healthcare Companies, Inc.'s motion for summary judgment (Docket #65) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's claims against Defendants Christopher Schmaling, Dr. Ortiz, and Correctional Healthcare Companies, Inc. be and the same are hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that Plaintiff shall file an amended pleading not later than **December 16, 2016** which identifies by name the Doe defendants 1, 2, 3, and 5, or his claims against them will be dismissed without prejudice for failure to prosecute;

**IT IS FURTHER ORDERED** that counsel for Dr. Ortiz and CHC shall file not later than **December 9, 2016** a notice and affidavit which explains the materials provided to Thomas in discovery that are relevant to the issue of identifying the Doe defendants, as well as the date those records were provided; and

**IT IS FURTHER ORDERED** that Plaintiff's motion to compel (Docket #52) be and the same is hereby **DENIED as moot**.

Dated at Milwaukee, Wisconsin, this 2nd day of December, 2016.

BY THE COURT:


*s/ J. P. Stadtmueller*
J.P. Stadtmueller
U.S. District Judge